WILLIAM CHARLES McCUTCHEON, ET AL., Trustee
vs.
ALICE BOOTH McCUTCHEON SCUDDER, ET AL.

Superior Court     Fairfield County     File #51902

MEMORANDUM FILED JANUARY 3, 1938.

Bronson, Rice & Lyman, of New Haven, for the Plaintiffs.

Cummings & Lockwood, of Stamford; Robinson, Robinson & Cole, of Hartford; David S. Day, of Bridgeport, for the Defendants.

SIMPSON, J. This is an action brought by the trustees under the will of James McCutcheon, deceased, for construction of a trust created by the will and for advice concerning certain administrative matters.

The testator, James McCutcheon, died January 20, 1914. His will created two trusts. The first trust created was for the benefit of the testator's widow. Under this trust, the trustees were given $40,000 to apply so much of the net income thereof to the support and maintenance of his wife, as, together with her own income from other sources, should equal five thousand dollars, and to pay the balance of the income to his children, or the survivors of them, during the life of his wife. Then followed provision for the disposition of the principal under certain contingencies. No question is raised in this action as to the construction of the meaning of this trust.

The testator then, in part fourth of his will, by appropriate language, gave all the rest, remainder of his estate to his executor in trust, and directed that the rest, residue and remainder be divided into four parts, the first and second parts to consist of 35% each thereof and the third and fourth parts to consist of 15% each, and then directed in subdivisions 1, 2, 3 and 4 of part fourth to whom the income from each of these part should be paid and the final disposition of the principal. No question is now raised as to the construction and meaning of subdivisions three and four, but only as to subdivisions one and two. These two paragraphs are as follows:

"1. That they pay the income of the first of said parts to my daughter, Theodora Nye, during her natural life, and upon her decease, leaving issue, that they pay and divide the principal thereof to such issue and the issue of such as are deceased, per stirpes. In the event that my said daughter shall die without issue her surviving and shall predecease my daughter, Alice Booth, I direct that the net income of this share shall be paid to my daughter Alice Booth during her natural life, and upon her decease that they pay and divide the principal of this trust to such person or persons and in such proportion as shall be appointed in and by the last will and testament of my daughter Theodora Nye, and in case of her failure to make a valid appointment that they pay and divide the same among her next of kin, per stirpes.

"2. That they pay the income of the second of said parts to my daughter Alice Booth during her natural life, and upon her decease, leaving issue, that they pay and divide the principal thereof to such issue and the issue of such as are deceased, per stirpes. In the event that my said daughter shall die without issue her surviving and shall predecease my daughter, Theodora Nye, I direct that the net income of this share shall be paid to my daughter, Theodora Nye, during her natural life, and upon her decease that they pay and divide the principal of this trust to such person or persons and in such proportions as shall be appointed in and by the last will and Testament of my daughter, Alice Booth, and in case of her failure to make a valid appointment that they pay and divide the same among her next of kin, per stirpes."

Testator's daughter, Theodora Nye, died March 26, 1917, a resident of the Town of Greenwich, leaving surviving her her mother, Frances M. McCutcheon, the beneficiary under the first trust created by the will, and who died September 21, 1934, her sister, Alice Booth, now Alice Booth McCutcheon Scudder, who is now living, and a niece, Elizabeth McCutcheon, a granddaughter of the testator. Since the death of Theodora Nye, Alice Booth has been receiving the income of 70 % of the trust as provided in paragraph 2. Theodora Nye made no appointment by will or otherwise as to the 35 % of which she had the life use.

The question now asked of the Court is whether under paragraph 2 Alice Booth has the power of appointment over the entire 70 % of the trust, or only over the 35 % of which she had the primary life use, and if not to whom the 35 %

of which Theodora Nye had the primary life use should go upon the death of Alice Booth, and if to Theodora Nye's next of kin, who are the next of kin.

The claim of Alice Booth is that the testator intended under the two reciprocal paragraphs 1 and 2 of part fourth of his will, that the surviving daughter should have the power of appointment over the entire 70%, and that she as such surviving daughter has that power, or in the alternative, that should the Court decide that she has no power of appointment over the 35% of which Theodora Nye had the primary life use, that this 35% upon the death of Alice Booth, go to the next of kin of Theodora Nye to be determined as of the date of the latter's death, viz., her mother, Frances M. McCutcheon.

Elizabeth McCutcheon, the granddaughter of the testator, claims that Alice Booth has no power of appointment over the 35% of which Theodora Nye had the primary life use; that this 35% should go to the next of kin of Theodora Nye to be determined as of the death of Alice Booth, the surviving daughter, and that Alice Booth should be excluded from membership in this class.

One of the primary rules of construction of a will is that a testator meant what he said, and that if the language used is clear and plain, effect should be given to it and unless there is some doubt or ambiguity there is no need to resort to implications. *State Bank & Trust Co. vs. Nolan,* 103 Conn. 308.

The attorney for Alice Booth argues with considerable cleverness and skill that inasmuch as the testator evidently intended to treat both daughters alike in the disposition of his estate, and inasmuch as he provided for the final disposition of the trust created for his wife under part third, paragraph 3 of the will, in the event that any one daughter survive his wife, the principal of the trust should go to such person or persons as she, the last surviving daughter, should appoint in her last will and testament, and in case of her failure to make a valid appointment that they (the trustees) pay the same to her next of kin, per stirpes, that the same intent (provisions) should be carried forward and applied to the disposition of the principal of the 35% of which Theodora Nye had the life use under the second trust. While this argument is ingenious, it is hardly persuasive. It appears to be a nonsequitur, as claimed by the attorney for Elizabeth McCutcheon. In the

first place the testator in the first trust is dealing with one trust fund of a minor importance to the second one, and has used apt and appropriate words to express his will as to the disposition of the principal of each, and it is unnecessary to import the terms of one trust into that of the other. If this could be done it might be argued with equal ingenuity that the principal of the first trust should be distributed as provided for the distribution of the principal in the second trust, which would lead to no conclusion. The fact is that the testator has used apt and express words for the disposition of the principal of the trusts created for his daughters. He evidently intended to treat his daughters equally, in that each, as long as she lived, should have a life use of an equal portion of his estate, and that in the event of the death of one without issue, the other should have the life use of both portions. He has avoided the use of ambiguous terms in the disposition of the principal of each portion. Nowhere in the trust is the word survivor used. He has provided in each instance that the daughter by name should have the life use of the portion of which the deceased daughter had the life use, and in each instance has provided that the principal of which the deceased daughter had the life use should, upon her decease, be divided and paid "to such person or persons and in such proportion as shall be appointed in and by the last will and testament," not by the surviving daughter, but by the specific daughter by name as had become deceased, and in the case of her failure to make a valid appointment then it should be paid and divided among "her next of kin, per stirpes."

It is held, therefore, that Alice Booth McCutcheon Scudder has no power of appointment over that portion of the estate of which Theodora Nye had the life use, and that inasmuch as Theodora Nye died without appointment it goes to "her next of kin, per stirpes."

Theodora Nye, as has been pointed out, died before her mother. No question is raised but that her mother was at the time of the death of Theodora Nye the next of kin of this daughter. But the attorney for Elizabeth McCutcheon claims that the heirs of Theodora Nye should be determined as of the date of death of Alice Booth, the surviving daughter (sister) and that in any event the mother Frances McCutcheon should be excluded from participating in the fund as the next of kin of Theodora Nye.

The latter proposition is based upon the well recognized

and established law in this State that where a testator gives a life use to a beneficiary who is also a next of kin to the testator, and the remainder to the testator's next of kin or legal heirs, the beneficiary's estate is precluded from participating in the remainder. That is, that the remainder should go to the testator's next of kin or legal heirs to be determined at the time of the death of the beneficiary. *Tingier vs. Woodruff*, 84 Conn. 684; *Union & New Haven Trust Co. vs. Ackerman*, 114 id. 152. Under certain contingencies as provided therein, this principal of law would apply to the first trust created for the wife. But it does not follow that the same principal of law would exclude the wife as the next of kin of Theodora Nye under the terms of the second trust. Under the terms of the second trust the wife was in no sense a life beneficiary and the principal of law stated does not apply.

Ordinarily the next of kin of a person are those existing at the time of that person's decease, and unless by the terms of the trust it is clear that the testator meant otherwise the general rule will apply. Here it seems that the testator has been most meticulous in the use of words to indicate his intentions. As has been said, at no place in the terms of the trust has he used the word survivor. To be sure, Alice Booth had an intermediary life use of that portion of the trust of which Theodora Nye had the primary use. The testator had in mind and contemplated that one of his daughters might predecease the other and made provisions for such contingency. After giving a life use of 35% of the trust to Theodora Nye, he provided that should she predecease Alice Booth, the net income of this share be paid to Alice Booth during her natural life, and upon her (Alice Booth) decease "they shall pay and divide the principal of this trust," not to whom Alice Booth should appoint, and not to the next of kin of Alice Booth, but "to such person or persons and in such proportion as shall be appointed in and by the last will and testament of my daughter, Theodora Nye, and in case of her failure to make a valid appointment that they pay and divide the same among *her* next of kin, per stirpes." Had Theodora Nye made an appointment there could be no question but that the appointees would obtain a vested interest at the time of the death of Theodora Nye. The testator is presumed to have known this, and the Court can read into the terms of the trust no other intent than that the next of kin of Theodora Nye were to be determined at the time of

her death. There certainly is nothing to clearly indicate the contrary.

Incidentally it might be said that the power of appointment given to his daughters over 70% of his estate, disposes of the claim that the testator intended to keep his estate for the benefit of his blood relatives. Under the power of appoint-ment either could have named an appointee not even remotely related to the testator.

No opinion is given on the questions asked regarding part 4, paragraph 3 of the will, because it would be indecisive and a matter of speculation at the present time.

Of the questions involved in this action, the administrative question asked regarding the leasehold interest in real estate in New York has given the Court more concern and perplexity than any other question involved.

It appears that the estate owns and did own at the time of the testator's death a leasehold upon property at Nos. 3, 5, 7 West 22nd Street, New York City, which was inventoried at a valuation at the time of the testator's death of $240,000. The leasehold expires May 1, 1963. The trustees were not required to retain this leasehold among the assets of the estate, but under the terms of the will the executors or trustees were authorized to sell any of the assets at their discretion. They were also authorized to retain any and all investments in which his property and estate might be found to be in-vested at the time of his death, either as part of the trusts created by his will or any one of them, or otherwise, and were exempted from any and all liability for losses or other injury to any estate, which shall not be shown to have re-sulted from their wilful acts or omissions, amounting to fraud. It does not appear to which trust or trusts this leasehold trust has been allocated, wholly or in part. Presumably it constitutes a part of the trusts created by part fourth, par-agraphs 1, 2, 3 and 4 of the will. The trustees have not entered into any renewals or modifications of the leasehold. Part fourth provides that the trustees are "to invest and rein-vest each of said parts (into which the estate is divided), collect the rents, issues and profits therefrom, and apply the net income from each trust" to the beneficiaries named in the four separate trusts created under part fourth.

The leasehold interest was not only a so-called wasting asset, but was also one which market and economic conditions might seriously affect. There can be no question but that

the remaindermen would have to bear the loss if any from the depreciation of the asset due to market and economic conditions. In view of this fact the Court cannot now assume that it is now of the pro-rata value as it was in 1914, when appraised.

A treatise might be written upon the questions involved in regard to the leasehold interest. From a reading of the authorities certain principles of law may be considered as established, at least by the weight of authority.

The use of the leasehold interest was not given to any specific beneficiary but became a component part of the trusts created. While the testator intended the net income from the trust to be paid to his beneficiaries, he also intended to create a permanent trust for at least during the lives of the beneficiaries. The leasehold interest was as much a part of the trust as any other asset or property included in the trust. It was, at the inception of the trust, principal. As such the remaindermen have an interest therein. The profits therefrom, if it exhausts the principal, does not all go to the beneficiaries. The earnings, because of the nature of the estate, are a blending of both income and principal. How much should be treated as income going to the life beneficiaries and how much to the remaindermen, has been a subject of much discussion. Different theories have been adduced. One is that the trustees, if the asset is retained in the estate, should pay the life beneficiaries interest on the valuation until sold and retain the balance of the earnings as principal. The other theory is that the trustees should make provision for amortization of the principal, or sell the asset. In this case the trustees set up an amortization fund out of the earnings and paid the balance to the beneficiaries. The amount set aside for amortization purposes was $1,000 per year. This they continued until and including 1931 when the leasehold became unproductive. While it does not appear from the complaint upon what basis the trustees set aside $1,000 a year for amortization purposes, it is stated in the plaintiff's brief that this would create a fund of $240,000 at the expiration of the lease if compounded annually at $5\frac{1}{2}$ per cent. While the rate of interest may or may not be large, the action of the trustees is warranted by well reasoned authorities. The amount of the amortization fund now equals, with accumulated interest, $32,188.73. It appears that for the year 1932 the trustees allocated to the amortization fund $1,000 when no net earn-

ings were received. As amortization can be set up only out of net earnings, and not from the principal or incomes from other trust property, the trustees should correct their account as indicated. When corrected the amortization fund, in the opinion of the Court, should be held, with accumulations therein, for the benefit of the remaindermen.

In 1932 it appears that the leasehold interest not only became unproductive but there was a deficit of approximately $6,000 and has since remained unproductive. The principle of amortization therefore can be no longer applied after that date.

While the terms of the will permitted the trustees to retain any portions of the trust estate and gave them discretionary powers in the disposal of it, this cannot be construed to evidence an intention on the part of the testator that an asset which has become unproductive should not be sold, nor an intention that the doctrine involving the handling of the wasting assets should not apply. (Anno. 109 A.L.R. 234, 236.)

When the leasehold asset became unproductive in 1932 it is the considered opinion of the Court that it was the duty of the trustees to sell the leasehold. From that time the doctrine of conversion of unproductive assets should apply. The Court is of the opinion the trustees should sell the leasehold interest as soon as may be reasonably done. When that is done the carrying charges from the date when the duty to sell arose, viz., 1932, to date of sale, should, with the costs of sale, be deducted from the sale price. This net amount, if any, should be apportioned between income and principal by ascertaining the sum which with interest thereon at the current rate of return on trust investments from the day when the duty to sell arose (1932) to the date of sale would equal the net proceeds. The sum so ascertained is to be treated as principal, and the residue as income.

Should the sale of the leasehold interest not produce sufficient to pay the carrying charges and expense of sale, as stated above, then the balance should be paid out of the principal of the general trust funds. This is contrary to the general rule that the carrying charges should be paid out of income unless the terms of the trust indicated otherwise, but on the doctrine of equitable conversion, it is justified.

As to the real estate situated at No. 4 West 22nd Street, New York City, the trustees are advised that this property

should be treated as a separate unit. The expenses of administration should be charged to income and adjustments made from year to year. When and if the trustees in their discretion sell the property, accumulated deficits, if any, from the time the property became unproductive, should be deducted from the sale price and the net proceeds prorated for the unproductive period between income and principal by ascertaining the sum which with interest thereon at the current rates of return on investment trusts from the date the property became unproductive to the date of sale, would equal the net sale price. The sum so ascertained is to be treated as principal and the residue as income.

Property procured by foreclosure of mortgages or obtained by quitclaim deed, and mortgages held on real estate after default of interest should be treated in the same manner.

The attorney for the plaintiffs may prepare a judgment file in accordance with this memorandum and after submitting it to the attorneys for the other parties, present it to the undersigned for approval